UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

ELHANNON LLC, et al                    :
        Plaintiffs,                    :
                                       :
        v.                             :      Case No. 2:14-cv-262
                                       :
THE F.A. BARTLETT TREE EXPERT          :
COMPANY,                               :
        Defendant.                     :

## OPINION AND ORDER

This case concerns a contract and consumer fraud dispute between
Plaintiffs Elhannon Wholesale Nurseries, LLC ("Elhannon"), a New York
corporation represented by Downs Rachlin Martin LLC, and its
predecessors, and Defendant F.A. Bartlett Tree Expert Company
("Bartlett"), a Connecticut corporation represented in this action by
Woolmington, Campbell, Bernal & Bent, P.C. On May 23, 2016, this Court
denied Plaintiffs' motion to compel complete discovery responses and
document production because Defendant represented to the Court that
its discovery responses were complete. ECF 68. Elhannon now renews
that motion on the ground that recent deposition testimony
demonstrates that Defendant's prior representations to this Court
asserting complete discovery responses were false. ECF 95. In
addition, both parties cross-moved for discovery sanctions. *Id.*; ECF
95 and 100. For the reasons described below, the Court grants
Elhannon's renewed motion to compel in part, denies the parties'
cross-motions for sanctions, and orders the parties to engage in
further meet-and-confer efforts to resolve certain factual disputes.

In its amended complaint, Elhannon alleges that between 2007 and 2014, Elhannon and Bartlett entered into a series of contracts calling for Bartlett to design and execute an integrated pest management program for Elhannon's entire tree nursery, which it called the "MoniTor" program. ECF 27. Elhannon allegedly relied on Bartlett's promised expertise and commitment to do whatever was necessary to properly protect its plants, and did not supervise or direct Bartlett's activities. In particular, it relied on representations made by Jeromy Gardner, a Bartlett employee in its Manchester, Vermont office, who later supervised the spraying work undertaken at Elhannon's nursery. Despite Gardner's representations and contractual promises, Bartlett alleges that Gardner directed Bartlett employee Jason Graham to underservice the nursery, leading to a large scale outbreak of disease and insects on its trees. In addition, Elhannon alleges that Graham, at Gardner's request, applied chemicals at Elhannon which were illegal under New York law in order to attempt to control an incipient outbreak. Graham was allegedly terminated after he refused to continue applying illegal chemicals, ostensibly because he would not support Graham's ineffective spraying program at Elhannon. Elhannon alleges that Bartlett had no intention of ever spraying the entire nursery or of fully following through on the misrepresentations it made to induce Elhannon to enter into the contract. It also asserts that Bartlett falsified its records to give the impression that it was performing more work at Elhannon than it actually did, and that it improperly billed Elhannon for work done for others. As a consequence of these failures, Elhannon faced a massive

pest problem, and has had to destroy trees valued at several million dollars and to implement its own pest management program. Elhannon brings claims for breach of contract, negligence, negligent misrepresentation, fraud and intentional misrepresentation, fraud in the performance, and violations of New York's General Business Law concerning consumer fraud.

## Background on Discovery Requests

(a)  <u>Outstanding document production</u>

Elhannon filed a Motion to Compel on February 15, 2016 seeking a more thorough production of the following categories of documents, which it asserts are responsive to outstanding discovery requests:

(1)    Complete information on the Elhannon account from Bartlett's Electronic Landscape Manager ("ELM") program, including printouts of all screens;
(2)    Internal correspondence and emails pertaining to Elhannon;
(3)    Internal analysis documents pertaining to Elhannon, including financial documents, estimates, and calculations of costs and profitability;
(4)    Certain compensation and personnel file materials for the two key Bartlett employees (Graham and Gardner) on the Elhannon contracts; and
(5)    Documents from Bartlett's other electronic systems (e.g., the NBS system).

These categories are also the subject of the discussion at issue here. Once again, the parties vigorously dispute whether the Defendant has already produced all relevant discovery pertaining to each category.

(1)  <u>Information from the ELM system</u>

Elhannon first asserts that two depositions of Bartlett employees –namely, Mr. Gardner and Mr. Andry –demonstrate that Bartlett failed to produce all screenshots from its ELM system concerning the company's relationship with Elhannon. In particular, in Mr. Andry's

deposition, the Plaintiffs were able to view the ELM program "in real time with the Elhannon account loaded," and were able to discern that "many more information screens existed (and could easily and quickly be printed out) than Bartlett had previously argued," including "a wealth of information related to Bartlett's proposals and work orders." ECF 95, p. 4-5. According to Elhannon, the information included in the system, evidenced during Mr. Andry's deposition, was "not included on any other documents produced to date by Bartlett." *Id.* at p. 6. This evidence, Elhannon asserts, contradicts Mr. Gardner's prior representation to the Court that all information and screenshots from the ELM system had been produced. In addition, Mr. Gardner later admitted in his deposition that he did not search for these documents, but rather delegated the ELM search and screenshot collection to an assistant who did not know how to use the system.

In its opposition, Defendant asserts that it was under no obligation to produce any additional screenshots of the ELM system. First, Bartlett argues that Plaintiffs did not request, and Bartlett did not purport to produce, "all screenshots." Rather, Elhannon requested all documents related to the relationship between the parties, and Bartlett only produced the screenshots with static screens rather than ones with editable input fields. It also asserts that the information that Plaintiffs request in their motion –i.e. additional screenshots –would be duplicative of information already produced, because that information "was used to generate documents that were already produced." Moreover, Bartlett argues that it

satisfied its production obligations by permitting Plaintiffs to inspect the ELM system in person.

In reply, Elhannon contends that it did request every single ELM screenshot, pointing the Court to Document Request numbers 5, 18, 39 and 42 and a letter dated December 22, 2015 which specifically asks for "a complete printout of the entire file, including all screens." ECF 103, p. 2. It further asserts that the distinction between static and editable screens in the ELM system is inapposite, since both types of screens could demonstrably be printed out and produced. More importantly, it asserts that "the Andry deposition confirmed that there is information in the ELM that does not appear in any documents generated from the system." *Id.* at 4. It argues that the screenshots are not merely another "form" of those documents produced by information in the system, because "each screenshot shows a different aspect of the Elhannon account and/or different information." *Id.* at 3. Finally, Elhannon contends that its ability to inspect the ELM system during Mr. Andry's deposition did not rectify Bartlett's failure to produce documents.

(2)  Email Production

In addition, Elhannon asserts that Bartlett previously misrepresented to the Court that it had produced "every email, company-wide, pertaining to the Plaintiffs in any way," when in reality its email searches were "haphazard, overly narrow, devoid of proper guidance by counsel, and unreliable to say the least." ECF 95, p. 6, 9-10. For example, Elhannon points to the deposition testimony of Paul Fletcher, the Assistant Manager and later Manager of

Bartlett's New England Division, and of Mr. Gardner, both of whom stated that they were not provided with search terms by counsel for their email searches, and neither of whom produced a substantial number of emails. Similarly, Elhannon alleges that the search terms used by Ms. Horton, the office administrator in Bartlett's Manchester, VT office, were too limited, and did not result in the production of the emails from Gardner to Elhannon that she testified about. Another Bartlett employee, Ms. Lindsay, made inconsistent statements about whether she had conducted email searches at all. Finally, Mr. Andry stated that he did not search for emails using Elhannon's Bartlett ID number or the pertinent work order numbers, which Bartlett witnesses suggested would be useful to identifying relevant documents.

In response, Bartlett acknowledged that it "recently recovered a number of emails previously not produced due to a gap in the technology used to perform its earlier email searches." ECF 101, p. 8. It states that the glitch was discovered on or about December 13, 2016, for reasons unrelated to Elhannon's discovery motions. Rather, "the discrepancy was the result of a limitation with the data storage system . . . that it began using in 2013," which did not reach archived emails in conducting a search of the database. *Id.* at 8-9. As a result, Bartlett had to directly access the computers of individual employees and conduct searches using remote access. Moreover, Bartlett argues that (1) the recently produced emails support its litigation position; and (2) Elhannon was also under an obligation to produce these emails, but failed to do so.

In reply, Elhannon asserts that the emails in fact support its position, and that the technological deficiencies Bartlett raises should have been evident to the Defendant much sooner. It further objects to the ostensibly limited search terms Bartlett employed to conduct email searches, even after the technological deficiencies were discovered. It argues that several Elhannon-specific terms and email addresses should have been used to conduct the search, along with the Elhannon work order and invoice numbers.

(3)  <u>Documents relating to cost and profitability</u>

In its renewed motion, Elhannon also argues that, contrary to Bartlett's prior assertion, Bartlett witness' deposition testimony demonstrates that information on the profitability of Bartlett's contract with Elhannon exists. In particular, Mr. Gardner testified that a particular client's profitability is determined using division-level price sheets, which are distributed to Bartlett's arborist representatives. In addition, Ms. Lindsay and Mr. Fletcher testified that Bartlett produced information on the financial performance of Bartlett's local offices periodically, and that they kept records that would permit them to do so, including the daily timesheets of its spray technicians in local offices. According to Elhannon, these materials have not been produced.

Bartlett responds that "the documents and cost analysis Elhannon now references in its discussion are *not* specific to the Elhannon account, and therefore [sic] not sought by these requests." ECF 101, p. 13. The local office financial reports and timesheets, for example,

were not account-specific, and "nothing in the deposition testimony shows that account-specific profitability analysis exists." *Id.*

In reply, Elhannon argues that it "learned that Bartlett indeed does have analyses and documents that, while not necessarily specific to Elhannon, are of the type from which Elhannon-related cost and profitability information can be derived." ECF 103, p. 8. For example, Bartlett's price sheets are relevant and responsive to Elhannon's discovery requests, but have not been produced. Similarly, timesheets, even when not exclusive to Elhannon, can be used to verify information contained in Bartlett's work orders. Finally, Fletcher's testimony that commissions are paid based on profitability suggests that account-specific calculations must exist, but also have not been produced.

(4)  <u>Personnel files</u>

Elhannon further argues that Bartlett failed to produce a complete set of Mr. Graham's and Mr. Gardner's personnel files. While Bartlett employees purportedly searched the company's IDOC system, where some personnel records are kept, along with the paper files held by the Human Resources office, Bartlett failed to search a second system containing employee performance assessments that Ms. Lindsay testified about. Moreover, Bartlett failed to produce Mr. Graham's timesheets, despite several witness' testimony that such timesheets exist.

Bartlett responds that Ms. Lindsay did not testify about a second system for employee performance assessments, but rather stated that the company developed a new program, called the Employee Assessment

and Performance Review Application, which was "rolled out" beginning in mid-December of 2013. Since the parties' relationship ended in the summer of 2013, the assessments in this program would not be temporally relevant to any of Elhannon's claims or defenses. In reply, Elhannon contends that "although Bartlett's work at Elhannon ended in 2013, . . . there was continued back-and-forth, and a key meeting[,] in 2014." ECF 103, p. 9. It asserts that Bartlett agreed to provide personnel information up to 2014, and therefore argues that any records covering up to the end of 2014 should be produced.

(5)  Other Bartlett Electronic Systems

Last, Elhannon argues that Mr. Gardner and Ms. Lindsay's searches of electronic files outside of Bartlett's email system were deficient, because Mr. Gardner did not precisely state what electronic systems he searched, while Ms. Lindsay only searched the IDOC system for personnel records. However, witness' deposition testimony suggests that Bartlett has three corporate databases concerning financial and accounting information, and an additional system (known as the NBS system) that serves as "the main point of entry for just about any data the [local] office needs to enter or look up." ECF 95, p. 14. Ms. Lindsay did not search NBS, and Mr. Gardner stated that he did not know why only two documents from the NBS system were produced. Moreover, Elhannon argues that the search of the IDOC system failed to turn up relevant company policy documents and manuals.

Bartlett responds that the NBS system is synced with the more comprehensive ELM system, and that both systems share a single database. Therefore, although duplicates from the NBS system were not

produced, "all requested, discoverable materials from the Bartlett system were produced to Plaintiffs in this matter." Moreover, Bartlett asserts that the policy documents Elhannon seeks were not covered by prior document requests, and that "the appropriate course of action would have been to follow up with a supplemental discovery request for those policies." In reply, Elhannon rejects that argument, pointing to Document Request numbers 29, 30, and 31. It also argues that Mr. Andry's deposition testimony provides that the NBS system is more comprehensive than the ELM system, and that in any case, even Bartlett's production from the ELM system was allegedly deficient.[1]

(b)   Meet and confer efforts

        In its cross-motion for sanctions, Bartlett argues that Elhannon failed to meet and confer prior to filing the instant motion to compel, in violation of Fed. R. Civ. P. 37(a)(1) and Local Rules 7(a)(7) and 26(d)(1). Rather, "all meet-and-confer efforts referenced in Plaintiffs' Motion occurred prior to Plaintiffs' February 2016 motion." ECF 100, p. 3. Moreover, Plaintiffs allegedly failed to compile a list of purported deficiencies in Bartlett's discovery production, as they promised to do after the parties' mediation. Elhannon argues that there is nothing new in its motion to compel, and that "the parties have been going back and forth on the issue of Bartlett's deficient discovery production since April 15, 2015." ECF 104, p. 2. However, "Bartlett has repeatedly and consistently taken

---

[1] The parties also dispute whether Mr. Gardner correctly stated that Elhannon documents were lost in a flood. There is no dispute that a flood occurred, and neither party asserts that the flood is a reason why some documents could not be produced. Therefore, the dispute is not relevant to Bartlett's compliance with the discovery requests at issue here, but rather provides additional fodder for the parties' mutual finger-pointing.

the position that it has produced every single available document, and that nothing further exists." *Id*. As such, Elhannon argues that further meet-and-confer efforts would have been futile. Furthermore, it sustains that even if the Court were to decide that further meet-and-confer is necessary before it can address the renewed Motion to Compel, the circumstances do not justify the imposition of sanctions.

Bartlett replies that (1) it has never refused to confer in good faith, and instead expected that Elhannon would produce a list of discovery disputes leading to further dialogue after the parties' mediation; (2) Elhannon should not be permitted to rely on its speculation about what would have happened had it entered into such dialogue in order to sustain that further meet-and-confer would have been futile; and (3) some of Elhannon's requests in its motion to compel were never part of any discovery request. Bartlett further argues that it could not have known of the technological limitation that led to gaps in its email production, and that it sought to remedy that oversight as quickly as possible. It then asserts that, "as a showing of its good faith, should Plaintiffs decide that they need to retake the depositions of Mr. Gardner and/or Mr. Fletcher to address the content of the emails, Bartlett would agree to pay a reasonable amount for attorneys' fees (capped at a reasonable sum-certain in advance) and the cost of deposition, in recognition that its late production of emails was attributable to a gap in its technology." ECF 106, p. 8.

**Discussion**

*a.   Whether the Court should order the production of additional discovery materials*

*(i)   Whether the documents at issue were within the scope of discovery requests*

Federal Rule of Civil Procedure 26(b) permits a party to "obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b). Moreover, discovery rules "are to be accorded a broad and liberal treatment to effectuate their purpose that civil trials in the federal courts no longer need be carried on in the dark." *Ratliff v. Davis Polk & Wardwell*, 354 F.3d 165, 170 (2d Cir. 2003). Here, Bartlett asserts that three of the five categories of documents sought by Elhannon —namely, the documents pertaining to cost and profitability of the Elhannon contracts, the outstanding personnel files from the end of 2013 and 2014, and the policy documents included in Bartlett's additional electronic databases —fall outside of the scope of Elhannon's discovery requests. After reviewing Elhannon's demands, the Court finds that each of these categories are both relevant and fall within the scope of Elhannon's requests, but requires the parties to engage in further meet-and-confer efforts to reach a common understanding of key factual issues.

First, in relation to cost and profitability documentation, the parties agree that document request number 20 is germane to the dispute. That request seeks "documents concerning the anticipated or expected costs or profits, or any analysis of the anticipated costs or profits, to be borne by or realized from the proposal to Elhannon; the

program offered to or intended for Elhannon; and/or the Elhannon contracts." In addition, the parties point to other document requests that may be relevant.[2] However, Bartlett argues that timesheets and office financial reports are not "account specific," while Elhannon asserts that timesheets and company "price sheets" are "of the type from which Elhannon-related cost and profitability information can be derived." ECF 103, p. 8.

The Court finds that at least some of this information falls within the scope of the document requests. Mr. Gardner testified that he would rely on price sheets to conduct a profitability analysis at the time of contract formation. As such, even price sheets that are not specific to Elhannon, if combined with additional testimony, are relevant to the profitability of the Elhannon contract. Moreover, at least on days when Bartlett claims to have serviced Elhannon for an entire day, the timesheet entries of the Bartlett employees working at the site would be specific to Elhannon. As such, these documents would "concern" the anticipated costs or profits of the Elhannon contracts, and thus fall within the scope of the document requests. Lastly,

---

[2] In particular, Document Request 18 seeks "All internal documents within Bartlett . . . relating to: a) the decision to make a proposal to Elhannon; b) the proposal to Elhannon; c) how the proposal was formed; d) the contracts; e) the performance of the contracts." Document Request 19 seeks "all documents or records reflecting, regarding, concerning, or in any way referencing . . . the amount of spraying to be done at Elhannon." Document Request 21 seeks "all documents showing the profits realized by Bartlett on the services performed for Elhannon." Document Request 23 seeks "All documents . . . concerning the timing of any treatments/sprayings to be conducted at Elhannon, and when those treatments/sprayings would be conducted, and why." Document Request 42 seeks "all documents (hard copy or electronic) created in tracking the activities and costs associated with the Elhannon contracts." Document Request 46 seeks "all documents showing Bartlett's actual costs associated with performing the Elhannon contract(s) (both in man-hours and chemicals); what revenue Bartlett generated; what profit Bartlett realized; and what Bartlett's profit margins are on inspections and treatments."

since the Court does not have a copy of the office financial reports in dispute, it cannot determine at this time whether information specific to Elhannon could be derived from these reports, even if the reports cover other business transactions as well. Accordingly, the Court hereby orders parties to engage in further meet-and-confer efforts to reach a common understanding of whether any Elhannon information is broken down in these reports, or is instead indistinguishable from a more general financial analysis for the office. To the extent that any information specific to Elhannon can be derived from the documents, the Court hereby orders that Bartlett produce the documents, even if they also contain financial analysis that is not specific to Elhannon.

Next, the parties dispute whether Bartlett's personnel records from the end of 2013 and 2014, which were included in a new employee assessment database, fall within the scope of Elhannon's requests for production. Document Request 17 seeks "[t]he complete employment or personnel file, excluding medical or personal information, of all Bartlett employees or representatives who ever visited Elhannon, including, but not limited to . . . performance reviews or appraisals." ECF 103-1, p. 2. Therefore, to the extent that the performance reviews date to a time period when Bartlett employees might still be engaged with Elhannon in some way, or if they were produced at a time after Elhannon and Bartlett's relationship ended but assess the employee's performance during the time when the relationship was ongoing, they would be relevant and fall within the scope of Elhannon's discovery request.

In its Amended Complaint, Elhannon alleges that Bartlett's spraying of Elhannon's property occurred between 2007 and 2013. It further alleges that Gardner came to Elhannon in September of 2013 and applied chemicals, and that Graham was fired by Gardner in February of 2014, purportedly because he would not support Gardner's spraying program at Elhannon and argued with him about it. Furthermore, the pleadings assert that Bartlett representatives, including Gardner, met with Elhannon representatives in April of 2014. Therefore, any records concerning Gardner and Graham related to their work in the final months of 2013 and the early months of 2014 would be relevant and within the scope of Elhannon's document request. In light of Bartlett's admission that it failed to search the employee assessment database that was implemented in late 2013, the Court orders the Defendant to produce documents responsive to Document Request number 17 which are relevant to the 2013-2014 time period.

Finally, Bartlett asserts that the policy statements included in its additional electronic databases are not responsive to any document requests, because Elhannon's requests that might be pertinent to this issue were overly broad and Elhannon should have followed up with narrowed requests for policy documents. However, Elhannon clearly requested the multiple, specific categories of policy documents at issue in its motion.[3] While some of these, such as Document Request 4,

_____

[3] As both parties acknowledge, Document Requests 29, 30 and 31 refer to such policy documents. Document Request 29 seeks "any and all manuals or guidebooks from 2007-2014 instructing divisions or branch offices how to operate and/or conduct their activities." Document Request 30 seeks "any and all manuals, guidebooks, and/or instructions regarding how to create, plan, implement, inspect, conduct and monitor an IPM program, and how to conduct inspections, prior to any deployment of chemicals." Document Request 31 seeks

are not tailored to the facts relevant to this case and thus are overly broad, other requests clearly relate to the conduct at issue, including the company's policies in developing an integrated pest management program. Accordingly, Bartlett should have instructed its employees to search relevant systems for such policies, and the Court orders Bartlett to do so to the extent that, as its employees stated in deposition testimony, they have not done so already.

*(ii)     Whether Bartlett must produce additional documents from electronic databases*

In addition, the parties disagree about whether Bartlett produced sufficient documents from the ELM database, the NBS system and other electronic systems. In connection with these categories of documents, the parties dispute whether (1) the Defendant must produce separate copies of documents contained in different formats or systems if they are coextensive (e.g. if a screenshot from ELM contains the same information as a document generated by the ELM system, or if a document from the NBS system produces information from the ELM system), (2) whether such systems or copies are coextensive at all, and (3) whether permitting Elhannon to inspect an electronic system would suffice to meet Bartlett's discovery obligations.

First, if the NBS and ELM systems are coextensive, and if Defendant had satisfied its obligations to produce documents from the

---

"any and all manuals, guidebooks, and/or instructions regarding how to create, plan, implement, inspect, conduct and monitor a non-IPM contract or program prior to any deployment of chemicals." In addition, Document Requests 2 and 3 request "manuals, memos, plans programs and/or emails" that discuss how to develop or create a proposal for a potential customer and how to develop or create a tree care program for a potential customer, respectively. Document Request 4 seeks "all instruction or guidance manuals in effect from January 1, 2007 to the present."

ELM system, it would not be under any further obligation to provide identical, duplicate forms of the same information. Fed. R. Civ. P. 34(b)(2)(E)(ii) provides that "if a request does not specify a form for producing electronically stored information [("ESI")], a party must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms", while subsection (iii) explains that "a party need not produce the same electronically stored information in more than one form". Fed. R. Civ. P. 34(b)(2)(E)(iii). Therefore, if ESI data is produced in one form, then the responding party need not re-produce it in the Plaintiff's preferred form. *See, e.g., A & R Body Specialty & Collision Works, Inc. v. Progressive Cas. Ins. Co.*, No. 3:07CV929 WWE, 2014 WL 4437684, at *4 (D. Conn. Sept. 9, 2014) ("Defendants have already produced the data sought. . . Accordingly, the Court will not compel defendants to reproduce the data in plaintiffs' preferred format, and the Court denies plaintiffs' request for a merged dataset.").

Similarly, if the documents produced by the Defendant essentially replicated the information contained in the ELM system, the Court would have discretion to limit the production of ELM data. In particular, the Court may refuse to require the production of ESI in any form where the information is available from other sources. *See Star Direct Telecom, Inc. v. Glob. Crossing Bandwidth, Inc.*, 272 F.R.D. 350, 359 (W.D.N.Y. 2011) ("a court may decline to order production of relevant electronically stored information from inaccessible sources if that information is available from accessible sources"). In order to justify such a ruling, however, Defendant would

need to make a showing that the ESI at issue is not "reasonably accessible because of undue burden or cost." *Id.* at 358. Defendant has not done so in this case. Moreover, Elhannon points to evidence suggesting that the substance of the information that would be derived from the ELM system is not, in fact, available from the documents already produced, and that the NBS and ELM systems do not simply provide two forms of the same ESI.

Specifically, despite Bartlett's representation to the contrary, deposition testimony suggests that the NBS and ELM systems are not co-extensive, and that the NBS system may contain documents not included in the ELM system. For example, Mr. Andry testified that the NBS system receives information from the ELM system and the payroll system, and that "all the databases just sort of exchange information in real time or daily." ECF 103-2, p. 4. That is, the ELM and NBS system "share one database." *Id.* at 6. However, he also testified that the NBS system is more comprehensive in "that it encompasses a lot more than just" what the ELM system includes. *Id.* at 4. Thus, Andry's testimony suggests that while the ELM system's information is synced with the NBS system, the NBS system contains additional information that the ELM system does not contain.

In addition, Elhannon set forth evidence suggesting that "there is information in the ELM that does not appear in any documents generated from the system." In particular, it points to information related to the profitability of the Elhannon contract (including the historical dollar return per hour on the account, the work rates, dollars earned in relation to tasks performed and proposal histories),

which it claims became apparent during Andry's deposition, but was not produced to it earlier. Bartlett does not claim that these specific pieces of information were produced to Elhannon, but instead summarily argues that it "should not be required to produce the same information already produced in less reliable form." ECF 101, p. 6. In light of the lack of specificity in Bartlett's response, and Elhannon's identification of various responsive, relevant pieces of information that have not been produced and are available through the ELM system, the Court finds that the existing document production is not coextensive with the outstanding ELM screenshots. Accordingly, the Court hereby orders Bartlett to produce relevant, responsive data from both the ELM and the NBS systems, to the extent that any relevant documents in one system are not available in the other system.

The remaining question, however, is whether Bartlett has partially satisfied that obligation by permitting Elhannon to inspect the ELM system. As noted above, Rule 34 provides that if, as in this case, a request does not specify a form for producing ESI, "a party must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms." Fed. R. Civ. P. 34(b)(2)(E)(ii). In addition, in 2015, the Federal Rules of Civil Procedure were amended "to reflect the common practice of producing copies of documents or electronically stored information rather than simply permitting inspection." Fed. R. Civ. P. 34, Advisory Committee's Note (2015). Fed. R. Civ. P. 34(b)(2)(B) now provides that "the response must either state that inspection and related activities will be permitted as requested or state with specificity

the grounds for objecting to the request, including the reasons. The responding party may state that it will produce copies of documents or of electronically stored information instead of permitting inspection." Thus, under the terms of the rules, either physical production of a document in the form in which it is ordinarily maintained or inspection of electronically stored information would suffice to satisfy a party's discovery obligations, so long as the party indicates the manner in which it purports to satisfy its obligations in its response.

In this case, however, Bartlett does not maintain that it responded to Elhannon's relevant request for production by permitting the inspection of records. Rather, it appears from the parties' filings that the inspection was incidental to Elhannon's deposition of Andry, and that Bartlett purported to comply with requests for production by producing some physical print-outs of the ELM system and some documents ostensibly generated by using information from the ELM system. Thus, it appears that the Defendant failed to state that it would permit an inspection in lieu of document production, as required by Rule 34. Moreover, unlike the Eastern District of New York case cited by Bartlett, in which the Court held that a party had comported "with both the letter and the spirit of Rule 34" by producing documents on CD's *and* subsequently permitting inspection in order to permit the opposing party to discern their relevance, Elhannon has suggested that Bartlett's document production was itself incomplete. *See Sky Med. Supply Inc. v. SCS Support Claim Servs., Inc.*, No. CV126383JFBAKT, 2016 WL 4703656, at *5 (E.D.N.Y. Sept. 7, 2016). In

addition, Bartlett is not offering to permit Elhannon to inspect its ELM systems at a given time on its own, independently of Andry's deposition. Therefore, the Court finds that Bartlett did not satisfy its obligations merely by allowing Elhannon to review the ELM system contemporaneously with a witness' deposition, without expressly stating that such an inspection constituted its response to Elhannon's requests for production.

*(iii) Sufficiency of email search terms*

The last outstanding dispute between the parties concerns Bartlett's email production. Essentially, Elhannon does not point to specific categories of emails that are missing, but instead contends that Bartlett employees should have used a different set of search terms to identify relevant documents. It does not, however, point to any case law to support this proposition. The Rules themselves do not provide a mechanism for a party to supply the search terms to be used by an opposing party in responding to document requests. However, numerous courts have warned that the process of producing ESI through keyword searches may be complicated, and that cooperation among counsel is central to ensuring compliance with discovery obligations. *See William A. Gross Const. Assocs., Inc. v. Am. Mfrs. Mut. Ins. Co.*, 256 F.R.D. 134, 136 (S.D.N.Y. 2009) ("Electronic discovery requires cooperation between opposing counsel and transparency in all aspects of preservation and production of ESI. Moreover, where counsel are using keyword searches for retrieval of ESI, they at a minimum must carefully craft the appropriate keywords, with input from the ESI's custodians as to the words and abbreviations they use, and the

proposed methodology must be quality control tested to assure accuracy in retrieval and elimination of "false positives."). Thus, when parties disagree on appropriate keyword search terms, courts may require parties to meet and confer in order to reach an agreement regarding the search terms that will be employed to produce a meaningful sample. *Pippins v. KPMG LLP*, No. 11 CIV. 0377 CM JLC, 2011 WL 4701849, at *9 (S.D.N.Y. Oct. 7, 2011) (citing *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 432 (S.D.N.Y. 2004) ("When the opposing party propounds its document requests, the parties could negotiate a list of search terms to be used in identifying responsive documents"). Given the parties' failure to engage in a comprehensive meet and confer or to reach agreement on the scope of email search terms, the Court will require the parties to do so now, rather than grant Elhannon's motion on this ground. If necessary, the parties may request the Court to approve a list of appropriate email search terms after their meet-and-confer.

b.   *Whether the Court should grant sanctions to either party*

(i)   *Whether Elhannon failed to satisfy its meet-and-confer obligation*

Federal Rule of Civil Procedure 37(a)(1) provides that a motion to compel discovery "must include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action." Fed. R. Civ. P. 37(a)(1). In this case, Elhannon purportedly "renews" its prior motion, which this Court denied, on the basis of evidence discovered during the depositions of relevant witnesses. In its motion, Elhannon justifies the categories

of documents it previously sought by pointing to evidence that certain, specific types of information had not been produced. The parties dispute whether, in such circumstances, their prior meet-and-confer efforts suffice to meet Elhannon's obligations under Rule 37, or whether Elhannon should have reengaged with Bartlett prior to filing the motion.

Courts have applied the meet-and-confer requirement to a party's renewed motion to compel. *See, e.g., Inhalation Plastics, Inc. v. Medex Cardio-Pulmonary, Inc.*, No. CIVA2:07-CV-116, 2010 WL 1445171, at *3 (S.D. Ohio Apr. 12, 2010) ("Defendant's counsel invited further discussion of remaining issues relating to Defendant's responses to Plaintiff's interrogatories and production requests. Rather than filing a motion to compel, Plaintiff's counsel should have accepted that invitation. For this reason, the Court denies the Renewed Motion to Compel."). However, contrary to Bartlett's suggestion, district courts maintain discretion to waive the meet-and-confer requirement. *See Care Envtl. Corp. v. M2 Techs. Inc.*, No. CV-05-1600 (CPS), 2006 WL 1517742, at *3 (E.D.N.Y. May 30, 2006) ("Courts have excused a failure to meet and confer where: (1) under the circumstances, the parties do not have time to attempt to reach an agreement; or (2) an attempt to compromise would have been clearly futile.") (citing *Yoon v. Celebrity Cruises, Inc.,* 1999 WL 135222, *6 (S .D.N.Y.1999)). In particular, courts look to the history of negotiations between the parties to determine whether further meet-and-confer efforts would be unfruitful. *See, e.g., Prescient Partners, L.P. v. Fieldcrest Cannon, Inc.*, No. 96

CIV. 7590(DAB)JCF, 1998 WL 67672, at *3 (S.D.N.Y. Feb. 18, 1998) (collecting cases).

In this case, the parties' filings indicate that counsel have approached each other with significant animosity, and that substantial challenges exist to narrowing discovery disputes. However, in light of Bartlett's representation that Elhannon promised to provide a list of outstanding discovery disputes after the parties' mediation but failed to do so, the parties' differences in this case cannot be solely attributed to Bartlett's uncooperative attitude. Thus, a meet-and-confer effort would not necessarily have been futile. Accordingly, the Court finds that the parties must fulfill their meet-and-confer obligation on certain discovery disputes as outlined above, particularly in order to resolve the appropriate scope of email searches and additional electronic searches in Bartlett's other databases. Nevertheless, the Court does not find that Elhannon's failure to meet and confer prior to filing the instant motion warrants the imposition of sanctions.

*(ii)     Whether sanctions should be imposed on either party for failing to satisfy their discovery obligations*

"Whether exercising its inherent power, or acting pursuant to Rule 37 [of the Federal Rules of Civil Procedure], a district court has wide discretion in sanctioning a party for discovery abuses." *Reilly v. Natwest Markets Grp. Inc.*, 181 F.3d 253, 267 (2d Cir. 1999). The Court is not persuaded that either party has provided sufficient reasons to justify sanctions against the other for failing to produce

documents, and hereby denies both parties' cross-motions for sanctions.

## Conclusion

For the foregoing reasons, the Court grants Elhannon's renewed motion to compel in part and denies it in part. ECF 95. Moreover, in light of indicators that Bartlett did not fail to comply with its discovery obligations in bad faith, the Court denies the Plaintiffs' motion for sanctions. *Id.* In addition, the Court declines to impose sanctions on Elhannon for failing to meet and confer prior to filing its renewed motion, but requires the parties to engage in further meet-and-confer efforts to narrow their differences on the appropriate scope of discovery. Thus, Defendant's cross-motion for sanctions and motion for leave to file a supplemental brief on this issue are hereby denied. ECF 100; ECF 109.

Dated at Burlington, in the District of Vermont, this 18th day of April, 2017.

/s/ William K. Sessions III
William K. Sessions III
District Court Judge